# The Law Offices of Jason Goldman

275 Madison Avenue, 35th Floor
New York, New York 10016
www.jasongoldmanlaw.com

Jason Goldman, Esq.                                    p. 212.466.6617
David Gelfand, Esq.                                    f.  212.931.6328
Admitted in NY & NJ                                    e. jg@jasongoldmanlaw.com


June 30, 2026

**BY ECF**
Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:** ***United States v. Derrick Van Yeboah***, **23-CR-263 (AS) (S.D.N.Y.)**

Hon. Arun Subramanian:

### A.    <u>INTRODUCTION</u>

This letter is submitted on behalf of defendant Derrick Van Yeboah in anticipation of his July 14, 2026 sentencing.  With this letter, the defendant respectfully requests a sentence which is "sufficient, but not greater than necessary to comply with the purposes" set forth in 18 U.S.C. § 3553(a)(2) due, in part, to the "nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The basis for this request is as follows: *first*, Mr. Van Yeboah has swiftly and unconditionally accepted responsibility for his criminal conduct, which reflects a marked deviation from his otherwise law abiding life; *second*, Mr. Van Yeboah is already proving that he is an excellent candidate for rehabilitation and has been a productive and proactive individual even during his incarceration; *third*, as the letters depict, Mr. Van Yeboah's wife and young children are suffering emotionally, mentally and financially without him; and *fourth*, a review of Mr. Van Yeboah's life finds that he has lived a life full of good deeds and service to his family, friends and community at large, long before he had any need to impress a Judge who would be determining his fate.

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

### B.   THE DEFENDANT'S GUILTY PLEA
### AND RESULTING GUIDELINES RANGE

On March 5, 2026, Mr. Van Yeboah pleaded guilty to Count One of the Indictment which charged him with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349.

Pursuant to this statute, Mr. Van Yeboah faces a maximum term of twenty years imprisonment, but no mandatory minimum term of imprisonment.  *See* Presentence Investigation Report ("PSR") at ¶ 78.  As recounted in the PSR, USSG §2X1.1 applies to Count One.  *Id.* at ¶ 31.  Pursuant to this statute, §2B1.1 is cross-referenced, which sets the base offense level at 7. *Id.*  Pursuant to USSG §2B1.1(b)(1)(K), a twenty-level enhancement is added because Mr. Van Yeboah is being held responsible for a loss amount of more than $9,500,000 but no more than $25,000,000.  *Id.* at ¶ 32.  Pursuant to USSG §2B1.1(b)(2)(A)(i) and (iii), a two-level enhancement is applied because the offense involved 10 or more victims and because at least one victim incurred financial hardship.  *Id.* at ¶ 33.  Finally, pursuant to USSG §2B1.1(b)(10)(B) and (C), a two-level enhancement is applied because the offense was committed from outside of the United States.  *Id.* at ¶ 34.  A three-level reduction is warranted for Mr. Van Yeboah's acceptance of responsibility (§3E1.1), leaving him with a total offense level of 28.  *Id.* at ¶¶ 41-42.  At a criminal history category of I, Mr. Van Yeboah's corresponding guideline range is 78 to 96 months' imprisonment.  *Id.* at ¶ 80.

The probation department correctly declined to apply the two-level vulnerable-victim enhancement under USSG §3A1.1(b)(1).  As the Application Note provides, a "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  PSR at ¶ 59.  The enhancement does not turn on a victim's membership in an age cohort.  The Second Circuit has squarely held that "being elderly is alone insufficient to render an individual 'unusually vulnerable' within the meaning of [§] 3A1.1(b)."  *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) ("In determining vulnerability, we focus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime").  The inquiry instead requires "an examination of the individual victims' ability to avoid the crime," and it disfavors enhancements premised on broad generalizations about victims based on their membership in a class.  *United States v. McCall*, 174 F.3d 47, 50-51 (2d Cir. 1998).

Applying these principles in the fraud context, courts have held it "clear error to impose a § 3A1.1(b)(1) increase simply because some of the victims of a widespread investment scam were elderly"; the enhancement "still requires a fact-based explanation of why advanced age or some other characteristic made one or more victims 'unusually vulnerable' to the offense

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

conduct." *United States v. Anderson*, 349 F.3d 568, 572 (8th Cir. 2003). The record here contains no such individualized showing. The identified victims were approximately 59 to 68 years old, and, as the probation department found, nothing in the record establishes that any of them was unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct. PSR at ¶ 59. To the contrary, probation noted that the sentencing courts in related cases arising from the same enterprise declined to apply this enhancement to victims in their sixties and seventies. *Id*.

That the parties stipulated to a different calculation in the plea agreement does not alter the analysis, because the Court is not bound by that stipulation. The agreement itself says so, reciting that "pursuant to USSG § 6B1.4(d) ... the Court is [not] bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts." Plea Agreement at 4. It further provides that "the sentence to be imposed upon the defendant is determined solely by the Court" and that "the Guidelines are not binding on the Court." *Id*. Notably, in the "event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same." *Id*.

Those recitals track settled law. As the Second Circuit has explained, "the sentencing judge is of course not bound by the estimated range" in a plea agreement. *United States v. Hamdi*, 432 F.3d 115, 124 (2d Cir. 2005). The Court must instead "begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc), and it commits procedural error if it treats the Guidelines as mandatory or adopts an erroneous calculation, *id*. at 190. The Second Circuit has applied this very principle to the identical § 6B1.4(d) language at issue here, confirming that a stipulated range "was not binding on the court" and that the court properly "independently determine[s]" the defendant's Guidelines range. *United States v. Camacho*, 622 F. App'x 23, 25, 28 n.3 (2d Cir. 2015) (summary order).

### Offense Conduct

The offense of conviction arises from a large, multi-tiered conspiracy, based principally in Ghana, that defrauded individuals and businesses in the United States through romance scams, business email compromises, and related frauds. PSR at ¶ 11. The enterprise operated as a hierarchy. At its apex were the "chairmen," who directed the activities of the other participants and received the lion's share of the profits. *Id.* at ¶ 15. Beneath them worked the "sakawa boys," who communicated with victims from behind a keyboard; the "middlemen," located in the

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

United States, who received the funds; and the "aboki," or agents, who moved the money back to West Africa. *Id.* at ¶¶ 12-13, 15.

Mr. Van Yeboah participated in this scheme as a sakawa boy. *Id.* at ¶ 16. Operating from Ghana, he communicated with victims in the United States, assumed fictitious identities, and induced victims to transfer funds and, in some instances, to assist in moving money for the conspiracy. *Id.* He did not direct the enterprise. The Government is "*not aware of any instances where he directly supervised or managed other co-conspirators*," and he held none of the chairman roles that controlled the conspiracy and collected the bulk of its proceeds. *Id.* at ¶¶ 15-16 (emphasis supplied). For Guidelines purposes, Mr. Van Yeboah is held responsible for a loss of $10,149,429.17, the *aggregate amount his victims transferred*. *Id.* at ¶ 17. That figure, however, *does not* measure the benefit he personally realized. As the probation department recognized, although Mr. Van Yeboah "appears to have made a substantial amount of money" from the scheme, "it is likely that a majority of the funds stolen from his victims *went to other members* of the Conspiracy." *Id.* at ¶ 19 (emphasis supplied). A significant portion of the attributed total reflects money that merely passed through accounts associated with his victims, including sums stolen from *other victims* and laundered through those accounts, rather than amounts Mr. Van Yeboah retained. *Id.* at ¶ 18.

The Government identified four individuals with whom Mr. Van Yeboah communicated directly. Three of them transferred funds between 2017 and 2020, and the amounts attributed to each reflect both that person's own losses and other victims' funds laundered through accounts in that person's name. *Id.* at ¶ 18(i)-(iii). The fourth was an attempted victim only: after a brief exchange of messages, he declined to send any money, and the contact ended without loss. *Id.* at ¶ 18(iv).

The conduct was non-violent and was carried out entirely through electronic communications. *Id.* at ¶¶ 16, 21. Mr. Van Yeboah neither used nor threatened force, and his participation remained confined to the keyboard-level role described above.

  C.  **THE DEFENDANT'S BACKGROUND**
     **AND THE NATURE OF THE OFFENSE** –
     <u>**APPLICATION OF § 3553(a) FACTORS**</u>

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines have been rendered advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors contained within 18 U.S.C. § 3553(a) and bounded by any applicable statutory minimum and maximum. This Section directs

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

sentencing courts to "impose a sentence" that is "*sufficient, but not greater than necessary*, to comply with" the "need for the sentence ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant ...." 18 U.S.C. § 3553(a)(1)-(2) (emphasis supplied). In making this determination, courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant ...." 18 U.S.C. § 3553(a)(1).

### The History and Characteristics of Mr. Van Yeboah

In limited time, we have received over 50 character letters in support of this submission, reflecting the significant and meaningful role that Mr. Van Yeboah has played in the lives of friends, family members and the community at large. It would be impossible to include a letter from every individual whom Mr. Van Yeboah has positively influenced. Still, the myriad letters on which we do remark[1] paint a consistent picture of a man who "has always shown himself to be a kind, respectful, and decent man who cares deeply about his family and the people around him." *See* Letter of Maya Boateng, attached as Exhibit A; *see also* Letter of Nana Kwame Yeboah, attached as Exhibit B ("Derrick has always been someone who is willing to help others whenever he can, whether it is supporting family members in difficult times").

Additionally, the letters establish that, while those closest to Mr. Van Yeboah are certainly well-aware of his conviction, they are also united in their firm belief that his actions did not include any acts of violence, as it would be completely out of character for the man that they know, deep-down, to be a charitable, caring and generous individual. *See* Letter of Eugenia Antwi, attached as Exhibit C ("He takes care of the less privilege and also takes care of orphans").

### Mr. Van Yeboah's Childhood, Upbringing, and Family

Before turning to the letters praising Mr. Van Yeboah's good character within the community, an examination of his childhood, upbringing, and current familial status – and the many hardships his loved ones are enduring – is warranted.

---

[1] For a collection of letters received on Mr. Van Yeboah's behalf which are not specifically cited to herein, please *see* Exhibit X. Ahead of sentencing, we strongly encourage Your Honor to read each and every letter filed on his behalf.

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

> i.       *A Childhood Defined by Poverty and Unmet Need*

Mr. Van Yeboah was born in Accra, Ghana, in 1985, the eldest of four children.  PSR ¶ 51.  His father supported the household as a metal scrap dealer and his mother sold goods at a local market.  *Id*.  For the first seven years of his life, the family lived together in a single-room hut on the outskirts of the city.  *Id*. at ¶ 53.  They moved only because his parents made the deliberate sacrifice of relocating into his grandfather's home so their children could obtain a better education.  *Id*.

Poverty in the Yeboah home was not an abstraction; it was a daily condition the children were expected to help relieve.  From a young age, Mr. Van Yeboah collected scrap metal alongside his father and helped a local woman sell food at the market after school in order to contribute to the family.  *Id*.  The extra food he carried home from that work was, on some days, the only food his family had to eat.  *Id*.  These are the formative experiences of the man the Court is sentencing: a child who labored so that his parents and siblings could eat.

> ii.      *A Home Marked by Harsh Discipline and Violence*

The hardship of Mr. Van Yeboah's childhood extended into the home itself.  As the oldest child, he was disciplined more severely than his siblings, including being slapped and beaten with a belt by his father in a manner he himself regarded as at times excessive.  *Id*. at ¶ 54.  He also grew up witnessing physical altercations between his parents, including his father striking his mother.  *Id*.  A childhood shaped by deprivation and domestic violence is precisely the kind of personal history that Section 3553(a)(1) directs the Court to weigh in arriving at an individualized and just sentence.

> iii.     *Faith and a Lifetime of Family Support*

Despite those circumstances, Mr. Van Yeboah was raised in a stable, intact, and religious household.  He was brought up in a Christian home, attended a Pentecostal church throughout his childhood, and continues to practice that faith today.  *Id*. at ¶ 55.  That foundation has held: his parents and siblings have remained supportive of him since his arrest.  *Id*. at ¶ 52.  A defendant who retains the support of the family that raised him, even from a continent away, is a defendant with a meaningful path back to a law-abiding life.

> iv.      *A Husband and the Financial Mainstay of Five Young Children*

Mr. Van Yeboah's most significant characteristic is his role as a husband and father.  He married Matilda Yeboah in Accra in 2013.  *Id*. at ¶ 56.  Together they have four children, ages

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

12, 9, 7, and 4. *Id*. His youngest son was born bow-legged and may require corrective surgery in the future. *Id*. Mrs. Yeboah, who herself manages insulin-dependent diabetes, now struggles to meet the family's needs without her husband's income and depends on the support of relatives. *Id*. Mr. Van Yeboah is also the father of a fifth child, a young daughter from a separate relationship, whom he supported financially from her birth. *Id*. at ¶ 57. The practical consequence of incarceration here falls heavily on five children who relied on him. That reality, expressly recognized as a permissible sentencing consideration, weighs in favor of a sentence that does not needlessly prolong his separation from the children who depend on him.

        v.       *Education and Self-Betterment Against Financial Odds*

Mr. Van Yeboah pursued education as far as his family's limited means would allow. He attended His Grace International School in Accra from ages five to fifteen, completing secondary school as an average student with no disciplinary issues. *Id*. at ¶ 64. He went on to a senior high boarding school roughly ninety minutes from Accra, graduating around 2006 or 2007. *Id*. at ¶ 65. He later enrolled in a construction program at Pentecost University from 2009 to 2011, but left before completing it, choosing to work in the construction field to gain experience and help support his family. *Id*. at ¶ 66. That same drive is reflected in his languages: he is fluent in Twi and Gbe, can also communicate in Ewe, and speaks, reads, and writes English fluently. *Id*. at ¶ 68.

        vi.      *Stable Health and No History of Substance Abuse*

Finally, Mr. Van Yeboah presents none of the risk factors that ordinarily justify a longer term of incarceration. His physical health issues, high cholesterol and prediabetes, are managed with medication, diet, and exercise. *Id*. at ¶ 61. He has no history of mental, emotional, or behavioral disorders and has never required mental health treatment. *Id*. at ¶ 62. He reports only social alcohol use, has never experimented with any controlled substance, and has never needed substance abuse treatment. *Id*. at ¶ 63. The absence of any substance abuse or mental health pathology, the very conditions that so often drive recidivism, supports the conclusion that Mr. Van Yeboah does not require a lengthy sentence to protect the public or to address treatment needs.

Taken together, these characteristics describe a forty-year-old first offender, raised in poverty and violence, who became the financial and emotional anchor of a large family. They are the individualized facts that Section 3553(a)(1) commands the Court to consider, and they fully support a lenient sentence.

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

## Reputation within the Community as a Selfless and Reliable Friend

The plethora of letters filed on Mr. Van Yeboah's behalf paint the potrait of an individual who is empathetic, unselfish, personable, and a loving member of the community. The Court has before it dozens and dozens of letters from those who know Mr. Van Yeboah best: his parents, his siblings, his twelve-year-old daughter, his pastor, a paramount chief, teachers, friends, neighbors, and the men and women whose lives he changed. They write from Ghana, the United Kingdom, and Hungary. They do not know one another, yet they describe the same man, and they describe him consistently: a person of quiet generosity, deep devotion to family, calm temperament, and genuine remorse. While Mr. Van Yeboah does not minimize the seriousness of the conduct to which he has pleaded guilty, the letters establish that this prosecution captures a single chapter – indeed, the worst one – but not the measure of the man as a whole.

i.    *A Sustained, Selfless Record of Helping Others in Need*

The most striking and consistent theme across the letters is that, for decades, Mr. Van Yeboah quietly used his resources to lift others, often strangers, and never for recognition or repayment. His cousin and employee Simon Armah writes that Mr. Van Yeboah "never seeks recognition or repayment, he simply helps because he genuinely cares about others." Letter of Simon Armah, attached as Exhibit D.

That generosity transformed lives. Dorcas Naa Dedei Mensah, who has known him for twenty years, describes how, when her father went blind and lost his job in 2006, Mr. Van Yeboah stepped in for nearly two decades. She writes without qualification: "I am a university graduate today solely because of Mr. Derrick Van Yeboah." Letter of Dorcas Naa Dedeu Mensah, attached as Exhibit E. She explains that "he saw my needs and helped my family without being asked," paying her tuition through her bachelor's degree, renting an apartment for her family, and providing her blind father and mother with a monthly allowance. *Id*. Hers is not an isolated account. Mr. Van Yeboah's sister, Dorencia Yeboah, writes that he "funded my 4 years through nursing training, today am able to save lives," and that "a lot of homeless kids are in school today because of Derrick Van Yeboah," for whom "[h]e does not only pay for their fees but also gave them a shelter." Letter of Dorencia Yeboah, attached as Exhibit F. Emmanuel Ofori, a barber, credits Mr. Van Yeboah with saving his life: "He rescued me from a life of addiction and helped me become the person I am today," recounting that "[w]hen I was struggling with drugs, Derrick paid for my rehabilitation program and supported me in getting back on my feet." Letter of Emmanuel Ofori, attached as Exhibit G.

His generosity repeatedly extended to those facing medical crises. His brother-in-law, Leslie Ayiku, writes that when his infant daughter suffered a complex heart condition and the

8

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

family had no money, "Mr Derrick Van Yeboah personally took care of the surgery bill to enable my child gain life." Letter of Leslie Ayiku, attached as Exhibit H. A community teacher, Suzana Ansah, confirms that "he has supported individuals who require medical assistance, including those in need of surgery." Letter of Suzana Ansah, attached as Exhibit I.

The letters describe the same pattern of housing and educational support reaching well beyond his family. Abigail Opare writes that during a difficult period in her life, Mr. Van Yeboah opened his home and, for two years, "provided me with food, clothing and accommodations without making any form of demands from me." Letter of Abigail Opare, attached as Exhibit J. Benjamin Azu-Crabbe, a friend of fifteen years, attests that he personally and repeatedly saw Mr. Van Yeboah "assist individuals and families with rent advances and school-related expenses," doing so "without any expectation or demand for repayment," with the result that "[m]any families in our community have been able to keep a roof over their heads or keep their children in school because of his quiet and consistent acts of kindness." Letter of Benjamin Azu-Crabbe, attached as Exhibit K. Joshua Nii Gyan Fennyberl likewise "personally witnessed Derrick supporting families in need by helping to pay school fees for children in the community." Letter of Joshua Nii Gyan Fennyberl, attached as Exhibit L.

This was not occasional charity but a way of life that began in childhood. His mother, Joana Van Yeboah, recalls that even at age ten, on trips to the market, "he will quickly rush and give all the food money given to him by his father to the amputees and street children." Letter of Joana Van Yeboah, attached as Exhibit M. His father confirms that Mr. Van Yeboah "sometimes go with me to the orphanage homes he mostly donates to every year." Letter of Daniel Kwame Yeboah, attached as Exhibit N. Judith Agyei recounts that he cared even for the orphaned child of a deceased friend: "He has a friend called oboezy who died by accident and Derrick Van Yeboah has been taking care of the only child his friend left behind." Letter of Judith Agyei, attached as Exhibit O.

    ii.    *Investment in the Whole Community*

Mr. Van Yeboah's good works were not limited to individuals; he invested in the welfare of his entire community. Ms. Ansah describes how "he has organized young men in the community to help repair damaged and untarred roads in the area, which has improved safety and accessibility for residents, especially school children." Ltr. of Suzana Ansah, Ex. I. Frank Asante recalls that "[h]e supported the community with a well laid drainage system to avoid floods in the neighborhood," and that "Mr. Yeboah supports a widow in the neighborhood and provides her with essentials for her upkeep." Letter of Frank Asante, attached as Exhibit P. Prince Adu Poku writes that when his church set out to build a home for the homeless, Mr. Van Yeboah "quickly Contributed alot and supported Financially to finished the building." Letter of

9

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

Prince Adu Poku, attached as Exhibit Q; *see also* Letter of Pastor Benjamin Mensah, attached as Exhibit R ("[d]uring occasions such as Easter and Christmas, he organizes food donations for widows and families who are struggling in the community").

The leader of his community speaks to the same character. Oboo Emma, the Paramount Chief of Sampa Valley Weija, writes that Mr. Van Yeboah "mobilized our youth, listened to their needs, and offered assistance wherever possible," and supported students unable to afford their education. Letter of Oboo Emma, attached as Exhibit S. Eric Kojo Van-Ess Kuranchie likewise attests that "[h]e's supported orphaned children in our neighborhood with their education, inspiring me to do the same." Letter of Eric Kojo Van-Ess Kuranchie, attached as Exhibit T.

### iii. *A Devoted Father Whose Children Need Him Home*

The letters establish that Mr. Van Yeboah is, above all, a devoted father to his young children. Pastor Mensah, who stays in the family home when he travels to Ghana, writes that "[h]e regularly takes his children to and from school, and on weekends he spends time with them at playgrounds and ensures they attend church on Sundays." Ltr. of Pastor Benjamin Mensah, Ex. R.

The most powerful evidence of that bond comes from his twelve-year-old daughter, Kaziah, the eldest of his four children. She writes that "[i]t's almost a year that we saw our Daddy .... [P]lease we want our Daddy to come home soon." Letter of Kaziah Van Yeboah, attached as Exhibit U. She describes the absence she and her siblings feel at school events meant for fathers, recalling that "when all Fathers were invited to attend our school's Father's sports Day celebration, I felt sad thinking about how my dad couldn't be there." *Id.* With today's submission we plead for a sentence that returns Mr. Van Yeboah to these children, *who need their dad*, as soon as possible.

### iv. *A Calm Temperament and an Otherwise Law-Abiding Life*

The letters uniformly describe a man of composure who has never been violent or otherwise in trouble with the law. Mr. Azu-Crabbe, who has known him fifteen years, writes that "he has always carried himself with quiet dignity and a calm temperament that has earned him the respect of all who know him." Ltr. of Benjamin Azu-Crabbe, Ex. K. His sister states plainly that "[h]e has no criminal record or ever got into fights back home." Ltr. of Dorencia Yeboah, Ex. F. Agyare Ohene Samuel confirms having "personally witnessed his willingness to help people in need and to support his family and friends during challenging times." Letter of Agyare Ohene Samuel, Ex. V. These accounts are consistent with a defendant who poses little risk of recidivism and for whom a lengthy term of imprisonment is not necessary to protect the public.

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

### Additional Months of Incarceration Will Not Provide Meaningful Rehabilitation

18 U.S.C. §3582(a) requires a sentencing court to "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation." *See United States v. Rosado*, 254 F.Supp. 2d 316, 321 (S.D.N.Y. 2003) ("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner."). "Additional months in prison are not simply just numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when [] the stakes are at their highest." *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017).

### Genuine Remorse and Acceptance of Responsibility

The level of remorse that Mr. Van Yeboah has is immeasurable beyond words, however, it is clear that this was truly aberrant conduct, and the letters appended to this submission detail the sincere regret that he has expressed.

Indeed, those closest to Mr. Van Yeboah describe a man who is genuinely remorseful and who has taken full responsibility for his conduct. His father writes simply, "I know my son is remorseful for what he did." Ltr. of Daniel Kwame Yeboah, Ex. N. Mr. Asante, who has known him since 2018, understands that "Mr. Yeboah has pleaded guilty to the charges against him and he has shown remorse for his actions." Ltr. of Frank Asante, Ex. P. Mr. Kuranchie agrees that "[h]e's shown remorse and taken responsibility for his actions." Ltr. of Eric Kojo Van-Ess Kuranchie, Ex. T. His cousin captures the sentiment of all the writers in observing that this offense "in no way tarnishes or summarizes his true image and the impact he's made on us back here at home." Letter of Kingsley Nii Lante Lamptey Jr., Ex. W.

Taken together, the letters paint a portrait of a man whose decades of selfless generosity, devotion to his children, calm character, and sincere contrition are precisely the "history and characteristics" that § 3553(a)(1) directs the Court to weigh. They support a sentence that is "sufficient, but not greater than necessary" to serve the purposes of sentencing.

11

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

**D.    RECOMMENDATION BY PROBATION, SIMILARLY SITUATED INDIVIDUALS AND MR. VAN YEBOAH'S REQUEST FOR LENIENCY**

In the instant matter, the probation department has taken the rare step of recommending a below-guidelines sentence for Mr. Van Yeboah.  Indeed, probation recommends that this Court sentence the defendant to a 60-month prison term, a significant deviation from his guideline range of 78 to 97 months.  In justifying its recommendation, the probation department, identified several variance factors.

> [Van Yeboah] is married and has five minor children for whom he was the primary financial provider.  The instant offense represents his only known arrest and conviction.  In addition, the defendant has no history of violence, and the instant offense was non-violent. He was gainfully employed prior to his arrest ....  Van Yeboah has had a positive adjustment to incarceration with no disciplinary infractions to date.  He completed a national parenting program and has held a work detail in MDC's kitchen since August 2025.[2] Furthermore, Probation acknowledges the need for the sentence imposed to *avoid unwarranted sentencing disparities* among similarly situated defendants while also taking into consideration the defendant's personal characteristics.
>
> *A variance from the guideline imprisonment range is appropriate* considering the factors in 18 USC §3553(a), including that the sentence imposed be sufficient, but not greater than necessary to comply with the purposes set forth in 18 USC §3553(a)(2).  We respectfully recommend the Court impose a sentence of 60 months' imprisonment.  This sentence would address the seriousness of the offense, promote respect for the law, provide just punishment for the offense, as well as general deterrence and specific deterrence to Van Yeboah.

PSR at p.25 (emphasis supplied).

As mentioned by probation, a number of other defendants have already been sentenced in connection with this investigation in separate cases.  *Id*. at ¶ 11, fn.1.  While some of these matters are still pending, a purview of the terminated cases include:

---

[2] *See* MDC Certificates, attached as Exhibit Y.

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

1) *United States v. Tourey Ahmed Rufai*, 18 Cr. 201 (DLC) (48-month sentence imposed for an individual who netted approximately $730,000 from conspiracy);

2) *United States v. Deborah Mensah*, 18 Cr. 201 (DLC) (70-month sentence imposed for "leader" of conspiracy who gained approximately $2,030,000 from conspiracy);

3) *United States v. Alhassan Iddris Lari*, 20 Cr. 143 (GBD) (24-month sentence for individual facing 46-57 month guideline and who accounted for $550,000 to $1,500,000 in losses);

4) *United States v. Faisal Ali*, 21 Cr. 613 (RMB) (46-month sentence for defendant accountable for approximately two-million dollars in fraud proceeds);

5) *United States v. Sadick Edussei Kissi*, 21 Cr. 64 (PAC) (imposing 36-month sentence for defendant accountable for approximately one-million dollars in fraud proceeds);

6) *United States v. Prince Nana Aggrey*, 18 Cr. 201 (DLC) (30-month sentence for defendant accountable for approximately $477,000 in proceeds);

7) *United States v. Mona Montrage*, 22 Cr. 617 (JPO) (12-month sentence for individual facing guideline range of 37-46 months and who was responsible for approximately $2,000,000 in fraud proceeds).

### E.    CONCLUSION

Derrick Van Yeboah comes before this Court as a broken man but also a man asking humbly for mercy and leniency.  A life filled with incredibly good deeds has now been marred by his criminal actions.  Mr. Van Yeboah has, unfortunately, disgraced his family and has disappointed his lifelong friends, who expect and know him to be empathetic and a man of strong morals and integrity.  For decades, they saw the absolute best in him, and Mr. Van Yeboah feels now he only returned the favor by showing his absolute worst.

Yet, those friends and family stand by him firmly in these most trying times.  They have not run away.  They have not gone silent.  They have not abandoned Mr. Van Yeboah, because they know who he truly is.  As the powerful enclosed letters reveal, Mr. Van Yeboah is a decent, caring, and giving man.  He is the rare defendant who, unlike many others before this Court, has made extraordinary efforts to help friends, family, and even strangers throughout his life *when no one was watching*, *when he had no need to impress a Judge deciding his fate*.  For these reasons

13

# Jason Goldman, Esq.

Hon. Arun Subramanian
United States District Judge
June 30, 2026

and the others stated herein, we respectfully urge this Court to sentence Mr. Van Yeboah with care and leniency.

Respectfully submitted,

Jason Goldman, Esq.

cc:     Mitzi Steiner and Kevin Mead
        Assistant United States Attorneys (by ECF & Email)

Encs.