

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 7, 2026

<u>**BY ECF**</u>

The Honorable Arun Subramanian
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Derrick Van Yeboah*, 23 Cr. 263 (AS)

Dear Judge Subramanian:

  The Government respectfully submits this letter in advance of the July 14, 2026 sentencing of defendant Derrick Van Yeboah ("Van Yeboah"). The defendant spent nearly a decade preying on vulnerable older individuals by pretending to be their romantic partners, ultimately stealing more than $10 million from them. For the reasons set forth below, a sentence at the top of the stipulated Guidelines range of 97 to 121 months' imprisonment (the "Stipulated Guidelines Range") is sufficient but not greater than necessary to serve the purposes of sentencing.

  **I.**  **Offense Conduct**

  **A.**  **The Fraud Scheme**

  Van Yeboah and his coconspirators all participated in a large-scale conspiracy based in Ghana (the "Conspiracy") to defraud businesses and individuals in the United States of, in total, more than approximately $100 million. The scheme perpetrated by the Conspiracy has consisted of, among other frauds, romance scams and business email compromises. (PSR ¶ 11). The Conspiracy operated in both the United States and Ghana, and referred to the internet fraud it committed as "sakawa." (PSR ¶ 12). The Conspiracy relied on a network of individuals, who worked collectively to engage victims in purported romantic relationships, and then, after acquiring the victims' trust, to direct the victims to transfer funds to accounts held by other members of the Conspiracy in order to launder the funds back to Ghana, as described below.

  Certain members of the Conspiracy acted as "sakawa boys" or "game boys"—these individuals operated behind the keyboard, directly interacting with romance scam victims online, and almost always lived in Ghana. (*Id*.). The sakawa boys conducted the romance scams by using electronic messages sent via email, text messaging, or online dating websites that tricked the victims, many of whom were vulnerable, older men and women who lived alone, into believing the victims were in a romantic relationship with a fake identity assumed by members of the Conspiracy. (*Id*.). Once a sakawa boy had gained the trust of the victims using the fake identity,

they used false pretenses—such as the need to make payments for a shipment of gold or promises to distribute a portion of an investment—to cause the victims to wire money to bank accounts the victims believed were controlled by their romantic interests, when, in fact, they were controlled by members of the Conspiracy.  (*Id.*).

The individuals who received the romance scam money from victims were called middlemen, and were almost always residing in the United States.  (PSR ¶ 13).  Once the middlemen received stolen money from a victim, they transferred the funds to individuals referred to as "aboki" or "agents," who, in turn, transferred the funds to other coconspirators in Ghana.  (*Id.*).  In some other instances, money was transmitted back to Ghana via trade-based money laundering, such as through frozen food or luxury car businesses.  (*Id.*).

At the top of the Conspiracy were individuals called "chairmen," who directed the activities of the sakawa boys, middlemen, and aboki, and who received the lion's share of the profits.  (PSR ¶ 15).  The chairmen almost all resided in Ghana.  (*Id.*).  The chairmen each controlled separate groupings of employees within the Conspiracy, although in practice there was a great deal of overlap: certain sakawa boys, middlemen, and aboki worked for multiple chairmen; chairmen would frequently partner with each other on particular deals, in that the sakawa boy for one chairman would direct that money from a victim be sent to the middleman for a different chairman; and the chairmen frequently communicated and socialized with one another. (*Id.*).

### B.      Van Yeboah's Role in the Conspiracy

From at least February 2015 through October 2024, Van Yeboah served as a successful sakawa boy who was also a high-ranking member of the Conspiracy. (PSR ¶¶ 16-17).  Van Yeboah directly communicated with romance scam victims in the United States from Ghana.  (*Id.*).  Specifically, Van Yeboah impersonated potential romantic partners, pretended to engage the victims in an alleged romantic relationship, and then defrauded the victims of funds by convincing them to transfer funds to bank accounts under the control of the Conspiracy.  (*Id.*).  Van Yeboah laundered fraud proceeds from his victims through, among other individuals and entities, "Vanscope Real Estate," a company he controlled in Ghana. (*Id.*).  Van Yeboah also convinced romance scam victims in the United States to (either wittingly or unwittingly) assist the Conspiracy in laundering funds by directing them to receive fraud money into bank accounts under their control.  In total, accounts controlled by Van Yeboah received approximately $10 million in fraud proceeds from over twenty victims of the Conspiracy.  (*Id.*).[1]

Certain of the victims who were personally defrauded by Van Yeboah are described below. (PSR ¶ 18).

---

[1] This number is likely an underestimate.  As described below, the identification of the exact number of victims is difficult, since a significant portion of the fraudulent funds Van Yeboah received were laundered through accounts held in the name of third parties, including victims, and Van Yeboah himself operated out of Ghana.  Nevertheless, Van Yeboah clearly defrauded, or attempted to defraud, substantially more than ten individual victims, and caused substantial financial hardship to at least one such victim pursuant to USSG §2B1.1(b)(2)(A)(i) and (iii).  (PSR ¶ 17, 33).

- **Victim "M.S."**  Van Yeboah directly communicated with M.S. posing as a romantic interest.  M.S. was an approximately sixty-year-old woman from Delaware who was romance-scammed by a man who identified himself as "Greg White," but who was, in fact, Van Yeboah.  At the direction of "Greg White," M.S. created the company "MSGW" and used it to launder money that the Conspiracy received from other victims.  The "MS" in MSGW stands for M.S.'s initials, and the "GW" stands for the fictional "Greg White."  In total, the Conspiracy, largely at the direction of Van Yeboah, received approximately $1.9 million from MSGW between July 2020 and November 2020, which represents either funds stolen from M.S. and/or funds stolen from other victims and laundered through MSGW.

- **Victim "J.W."**  Van Yeboah directly communicated with J.W. posing as a romantic interest.  J.W. was an approximately sixty-five-year-old woman from Ohio who was romance-scammed by a man who identified himself as "Gary Bushmier," but who was in fact Van Yeboah.  At the direction of "Gary Bushmier," J.W. created the companies "GCTW" and "GBW" and used them to launder money that the Conspiracy received from other victims.  In total, the Conspiracy, largely at the direction of Van Yeboah, received approximately $2.3 million from GCTW and GBW between November 2017 and August 2020, which represents either funds stolen from J.W. and/or funds stolen from other victims and laundered through GCTW and GBW.

- **Victim "B.R."**  Van Yeboah directly communicated with B.R., an approximately seventy-year-old woman, posing as a romantic interest.[2]  In total, the Conspiracy, largely at the direction of Van Yeboah, received approximately $1 million from B.R. between October 2017 and March 2019, which represents either funds stolen from B.R. and/or funds stolen from other victims and laundered through B.R.

- **Victim "R.B."**  Van Yeboah directly communicated with R.B. posing as a romantic interest.  R.B. was an approximately sixty-eight-year-old man in North Carolina who was romance-scammed by a woman who identified herself as "Lisa G. Olson," but who was, in fact, Van Yeboah.  Between October 13, 2024 and October 24, 2024, R.B. and "Olson" exchanged at least approximately 470 text messages, copies of which were obtained from Van Yeboah's Ghanian cellphone that was seized incident to his arrest.[3]  "Olson" claimed that her mother died and that she required $50,000 in funeral expenses.  While that initial gambit failed, Van Yeboah (still pretending to be "Olson") ultimately tricked R.B. into sending approximately $123,000 as a loan to the Conspiracy, to allow "Olson" to remove imaginary gold and diamonds from storage in Italy.[4]  Certain of Van Yeboah's messages

---

[2] B.R. has been uncooperative with the Government's investigation and the Government therefore has limited information about her.

[3] The messages make clear that Van Yeboah was also communicating with R.B. prior to these communications in October 2024.

[4] At the time the PSR was initially being prepared, the messages between R.B. and Van Yeboah in the Government's possession appeared to show that the contact between Van Yeboah and R.B.

to R.B. are reproduced in detail at paragraph 18(iv) of the PSR, and make clear the cruel manner in which Van Yeboah (posing as "Olson") attempted to play on his false romantic relationship with R.B., and R.B.'s sympathy for the invented death of "Olson's" mother, in order to defraud R.B.

Van Yeboah made a substantial amount of money from his role in the Conspiracy.  (PSR ¶ 19).  It appears that the defendant has never had a real job—his purported business, "Vanscope Real Estate" was used to launder proceeds of his fraud—and yet he reported to Probation that he owns a house valued at $500,000, jewelry valued at between $200,000-$300,000, and multiple luxury vehicles.[5]  (PSR ¶ 73).

When Van Yeboah was arrested in Ghana, Ghanaian law enforcement found him in possession of a Mercedes that had been stolen from the United States and a Lexus that had been stolen from Canada.  (PSR ¶ 19).  In addition, at the time of his arrest, Van Yeboah was in possession of several firearms and ammunition, a photo of which is below:



ended without R.B. sending any money, as reflected in the PSR.  (PSR ¶ 18(iv) ("communications between 'Olson' and R.B. ended after R.B. refused to send the money")).   However, the Government subsequently spoke with R.B., who informed the Government that he was, in fact, deceived by "Olson" into sending $123,000 to the Conspiracy for the purported purpose of assisting "Olson" in retrieving the gold and diamonds.  A copy of R.B.'s victim impact statement is attached hereto as Exhibit A, Statement 2.  The Government therefore objects to the language in paragraph 18(iv) of the PSR to the extent it reflects that R.B. did not send money to Van Yeboah, in light of this newly obtained information from the victim.

[5] The Government notes that Van Yeboah previously told Pretrial Services that his assets were substantially greater, including a house that was worth $1.5 million and jewelry that was worth $515,000.

## II.    Procedural History and Guidelines Range

### A.  Arrest and the Plea Agreement

On May 30, 2023, a grand jury returned a sealed five-count indictment for Van Yeboah (the "Indictment").  On June 13, 2025, in response to a request for extradition, the government of Ghana arrested Van Yeboah, and he was extradited to the United States in August 2025.  On March 5, 2026, Van Yeboah pleaded guilty to conspiracy to commit wire fraud (Count One of the Indictment) pursuant to a plea agreement (the "Plea Agreement").  In addition, Van Yeboah agreed to forfeit $10,149,429.17 in fraud proceeds.

The parties agreed to the following Guidelines calculation in the Plea Agreement: (1) the base offense level is seven; (2) 20 levels are added because the loss is between $9.5 million and $25 million; (3) two levels are added because the offense involved 10 or more victims and/or resulted in substantial financial hardship to one or more victims; (4) two levels are added because a substantial part of the fraudulent scheme was committed from outside the United States and/or the offense otherwise involved sophisticated means; (5) two levels are added because the defendant knew or should have known that a victim of the offense was a vulnerable victim; and (6) three levels are reduced because the defendant accepted responsibility.  The resulting offense level is 30, the defendant is in criminal history category I, and the Guidelines calculation is 97 to 121 months' imprisonment.  (PSR ¶ 80).

### B.  The Vulnerable Victim Enhancement, U.S.S.G. § 3A1.1(b)(1)

Probation agrees with the Guidelines as calculated in the Plea Agreement, with the exception of the vulnerable victim enhancement, which it states is inapplicable.  (PSR ¶¶ 31-42, 79-80, page 22).[6]  As such, Probation calculates an offense level of 28 and a Guidelines range of 78-97 months.  (*Id.*).[7]  The defendant similarly contends that the enhancement for vulnerable victims does not apply.  (Br. at 2-3).  The defendant—with extensive knowledge of his own conduct and represented by able counsel—explicitly agreed to the contrary in the Plea Agreement.  Further, to the extent the defendant now argues that the vulnerable victim enhancement is inapplicable, such an argument would be in breach of the Plea Agreement.  But, more importantly, he is wrong.

---

[6] In refusing to apply the enhancement, Probation largely relied upon the fact that, "A review of related cases reveals that this enhancement was not applied by the Court in cases with identified victims in their sixties and seventies."  PSR p. 22.  However, the enhancement requires not just that the victim **be** vulnerable, but also that "the defendant knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  Nearly all of the related cases involved defendants who were laundering money on behalf of the Conspiracy, while Van Yeboah was uniquely situated in that he was directly involved in scamming the victims, making it transparently clear to him how vulnerable they were.

[7] For the reasons set forth below, the Government objects to the calculation reflected in the PSR to the extent the PSR failed to apply the vulnerable victim enhancement.  That objection implicates paragraphs 35, 42, 79, and 80 of the PSR.

The vulnerable victim enhancement is clearly applicable.  As an initial matter, the Government has been unable to identify all of Van Yeboah's victims, due to challenges tracing victims who appear to have communicated with Van Yeboah over a variety of online dating and social media services.  Further, Van Yeboah laundered the funds of his victims through bank accounts of other coconspirators and, moreover, through the accounts of his victims, including MSGW, GCTW, and GBW that were held in the name of M.S. and J.W., respectively.  In addition, the Conspiracy appears to have relied exclusively on sakawa boys in Ghana, rather than the United States, thereby aiding the Conspiracy in avoiding detection by U.S. law enforcement.

Nevertheless, the Government has identified a consistent pattern that Van Yeboah and his coconspirators used to target vulnerable victims.  Sakawa boys would initially engage in a courtship period with a potential victim for a period of weeks or months, prior to requesting any funds.  In this manner, Van Yeboah and his coconspirators were able to identify the unique vulnerabilities of their victims and to establish a relationship of trust which enabled the subsequent fraud.  Van Yeboah and his coconspirators sought out victims who were emotionally and socially vulnerable—often because they were recently divorced or widowed—and therefore lived alone and without the support of a romantic partner.  Several of these individuals were also advanced in age and therefore less familiar with the risks posed by online dating.

As a sakawa boy, Van Yeboah was in frequent and direct communication with his victims. He spoke to his victims frequently about the most intimate details of their lives, and he capitalized on the loneliness and emotional fragility resulting from the personal tragedies that they experienced.  For example, as described above, Van Yeboah exchanged approximately five hundred messages with R.B. over the course of an approximately ten-day period alone.  As such, Van Yeboah was able to uncover the unique vulnerabilities of his victims—who confided in him regarding their personal challenges and family circumstances—prior to proceeding with his fraudulent requests for funds.  Further, he found many of his victims on dating websites like Our Time, which specifically cater to older individuals.

The victim impact statements provided by the victims, and attached hereto as Exhibits A, reflects their unique vulnerabilities that Van Yeboah preyed upon.[8]  Consider, for example, the victim impact statement submitted by M.S., attached hereto as Exhibit A, Statement 1, who Van Yeboah personally scammed out of substantial funds.  She states: "I became a widow after losing my husband, the person who was my partner, confidant, and source of comfort for many years. The loss of my husband left me vulnerable, lonely, and struggling to rebuild my life.  After a few years had passed I felt ready for companionship again and decided to try a dating app called Our Time. . . . [The defendant] deliberately preyed upon my loneliness and grief, manipulating me into sending money . . . [the defendant] exploited one of the most vulnerable periods of my life and saw my pain not as something deserving compassion but as an opportunity for profit."[9]  Similarly, the defendant targeted victim R.B. shortly after R.B.'s wife died, making him vulnerable for the

---

[8] The Government respectfully requests that all victim statements be received by the Court under seal in order to protect the privacy of the victims.

[9] The Government received this statement on June 25, 2026, three days after the PSR was finalized. The statement was therefore not available to Probation when it incorrectly decided that the vulnerable victim enhancement did not apply.

same reasons.  As R.B. explains in his victim impact statement, attached hereto as Exhibit A, Statement 2, "I believe they targeted me because of my advanced age (68) and being a recent widower."

The defendant argues that the vulnerable victim enhancement is nevertheless inapplicable because the victims were vulnerable solely as a result of their advanced age.  (Br. at 2-3).  The defendant is mistaken.  While "being elderly is alone insufficient to render an individual 'unusually vulnerable' within the meaning of 3A1.1(b), courts frequently have found elderly individuals to be unusually vulnerable to fraud schemes," where, as here, they operate by directly contacting elderly individuals who are more susceptible to the scheme.  *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) (internal citations omitted); *see also United States v. Sinnott*, 523 F. App'x 807, 810 (2d Cir. 2013) (noting that "many cases have upheld vulnerable victim enhancements based on group generalizations, especially in the present context of predatory financial schemes.") (internal citations omitted).

Further, this is not a case where the sole criterion for applying the vulnerable victim enhancement was age—age was simply one of the several factors that made Van Yeboah's victims vulnerable.  Clearly, what made M.S. vulnerable was not just her age.  It was also the recent death of her husband and the resulting grief and loneliness.  That tragedy made her both in need of comfort—a need the defendant cruelly exploited—and also took away the protection of a family member who lived with her and could have advised against sending money in response to Van Yeboah's fraudulent requests.  *See United States v. Getto*, 586 F. App'x 11, 14-15 (2d Cir. 2014) (affirming application of vulnerable victim enhancement where there was evidence the defendant "would actually look for people who were not only 70 or 80 years old . . . but [also] had problems of one sort or another in the reasoning world, and focus in on them.") (internal citations and alterations omitted); *United States v. Harris*, 38 F.3d 95, 99 (2d Cir. 1994) (affirming application of vulnerable victim enhancement where victims included widows, since "[b]y virtue of their ages and difficulties in providing for themselves, they were particularly susceptible to alluring promises of financial security.").  Similarly, Van Yeboah targeted R.B. not only because of his age, but also because his wife had recently passed, and he was therefore particularly emotionally vulnerable to Van Yeboah's purported advances.  Either of these victims would be sufficient to support a vulnerable victim enhancement.  *See* U.S.S.G. § 3A1.1(b)(1) (applying vulnerable victim enhancement "[i]f the defendant knew or should have known that *a* victim of the offense was a vulnerable victim.").  And the defendant does not contest that many of the victims of the Conspiracy "were vulnerable, older men and women *who lived alone*."  ((PSR ¶ 12) (emphasis added)).

Accordingly, the Court should apply the vulnerable victim enhancement as applied in the Plea Agreement, pursuant to U.S.S.G. § 3A1.1(b)(1).

███ ██ ████████████

██ ████████████
████████████████████████

---

[10] ████████████████████████████████
█████████████████



## IV.     Victim Impact Statements

As described above, the Conspiracy targeted a number of vulnerable victims with its romance scams.  The Government has identified at least twenty individuals from whom Van Yeboah received fraud proceeds, at least four of which Van Yeboah personally and directly victimized through romance scams.  In addition, the Government's prior investigations have detailed numerous other victims that were victimized by other coconspirators in the Conspiracy.

As detailed above, M.S., submitted a victim impact statement, which is attached here as Exhibit A, Statement 1.  M.S. explains in her victim statement that, "The loss of my husband left me vulnerable, lonely, and struggling to rebuild my life . . . I believed that I had found someone who cared about me and understood my grief.  Instead I became the victim of a cruel romance scam."  As a result of Van Yeboah's fraud, M.S. "suffered significant financial losses.  The money lost represented years of savings and financial security that I had preserved after my husband's death.  Funds that were meant to maintain my independence, pay living expenses, and peace of mind for my retirement but instead were taken away from me through deception and exploitation."  But, "[t]he emotional impact has been even greater.  I have experienced humiliation, shame, anxiety, depression and sleepless nights.  I question my own judgment and find it difficult to trust. I have felt embarrassment and isolation."

R.B. also submitted a victim impact statement, which is attached here as Exhibit A, Statement 2.  As he explained, "I have suffered through many things over the last few years including the loss of my wife and my mother.  I believe they targeted me because of my advanced age (68) and being a widower.  The money they stole was primarily from the proceeds of my mother's estate, which I was going to use to make repairs to my home and help my children.  Since the money is gone, I am planning to sell my house next year and downsize.  To summarize, their fraud cost me $123,000, but they also stole my belief that I was safe and secure." *Id.*

In addition, the Ghana Financial Intelligence Centre ("GFIC") has submitted a victim impact statement, attached hereto as Exhibit A, Statement 3, detailing the impact of crimes like

8

the romance scams perpetrated by Van Yeboah on the Ghanian economy. The letter explains the way that such crime undermines trust in Ghana's financial system, damages Ghana's reputation, causes reduced foreign investment, and results in "the systemic sabotage of our national economic aspirations." As the GFIC states, "While individual victims have suffered direct and huge losses, the unseen victim of this sophisticated fraud and money laundering scheme is the integrity of our national financial system, institutional credibility and international standing of the nation." Further, "[t]his reputational damage is not easily repaired as it takes time to undo the perception of the country being branded a safe environment for illicit flows . . . Legitimate global investors become hesitant to commit capital when the local financial ecosystem is perceived as compromised leading to reassessments of risk exposure, delay in commitments and possible diversion of investments to other jurisdictions." As a result, the GFIC notes that "the offender has effectively stolen growth opportunities from the youth and legitimate workforce of the country."

Finally, the Government has identified at least approximately two hundred other victims in the cases of just two of Van Yeboah's coconspirators: Fred Asante and Celvin Freeman. *See United States v. Fred Asante and Celvin Freeman*, 21 Cr. 88 (JSR). While the Government has no evidence that Van Yeboah was directly involved in scamming these specific victims, he was connected to both defendants in the fraud scheme. As such, the Government includes victim impact statements from the sentencings of both Asante and Freeman, attached hereto as Exhibit B, to show the devastation wrought by romance scams committed by Van Yeboah and his coconspirators. (*See* PSR ¶ 27). Excerpts of some of those statements are below:

- "Mark [the online identity impersonated by a member of the conspiracy] begged me to sell my home. I have many loving emails from him. He took such advantage of me . . . It was the wors[t] thing that ever happened to me." "I already drained my children's inheritance . . . and my bank accounts." "This man had not only taken $350,000 in cash which is an estimate. He ruined my credit. I was unable to grieve my mother's death. I have kept secrets from my children. I had to rebuild my life all over again at a very older age. It's very hard for me to trust. I don't answer calls unless it's family. I will never touch the computer again." Exhibit B, Statement 1.

- "I am writing this in regards to the sentencing of the schemers who took advantage of my mother at her most vulnerable time and effectively broke up my family . . . After a year of grieving [her husband's death] my mom decided to join a dating app. She had never dated any man other than my father, as she got with him when she was only 15 years old, and had no idea how evil the world could be . . . [My mother] decided she needed to go back to work since sending this man 25k of the only money she had left to retire on at 58 years old. Our family has been split apart and I don't foresee it ever being made whole . . . My mom has never returned to the dating world since this happened, she has been traumatized by this nightmare. I do not want my mother to grow old alone but there is a chance that will be her fate." Exhibit B, Statement 2.

- "Mr. Asante and the group of people that worked with him have defrauded me out of over $125,000. This greatly affected my financial situation . . . I had to sell my dream house that I worked extremely hard for . . . The emotional impact has been extreme humiliation that this has happened and that I was lied to for so long. . . . I've lost trust in people in

general.  The stress of having to pay back all that money has been unbearable . . . I wish I could feel normal again."  Exhibit B, Statement 3.

- "Prior to this scam, I was a very trusting person, but now I am le[e]ry of everyone.  I was very depressed and upset that I let him take advantage of me and my good nature.  It took a toll on me mentally for many months and even to this day when I think back on it. Financially, I was on the road to retirement having worked very hard for many years. This scam has forced me to work longer to rebuild my finances."  Exhibit B, Statement 4.

- "[M]y mother [lost] over $749,000 dollars [to the scheme] . . . putting herself into debt and completely erasing 50 years of savings & investments. When everything came crashing down, she was forced to sell her home to pay off her debts and is now, still, over a hundred thousand dollars in debt to Hard Money Lenders and the IRS.  It has been devastating. . . . Relationships have been destroyed.  Trust has been lost.  An entire LEGACY eliminated. My mother will never be able to leave anything to her children, her grand children, her great grand children.  It is all gone.  My mother will never be able to recover from this. She has lost most of her friends.  My brother and sister can barely speak to my mother any more, due to the resentment this scheme has caused."  Exhibit B, Statement 5.

- "[M]y mom lost her life savings and her dignity as a result of this fraud . . . [M]y mom went into severe debt as well as depression. My sister and I helped her avoid bankruptcy by shouldering many of her debts, and she has moved in with my family and me.  She now lives in government-subsidized housing."  Exhibit B, Statement 6.

- "This money that was extracted from me has caused much humiliation and financial hardship. I borrowed the funds that I sent to Mr. Freeman and now have no way to pay them back. I am in jeopardy of loosing my home because of this debt." Exhibit B, Statement 7.

- "My first husband of 49 years and myself, worked hard and scrimped to save and invest in the land we farmed. I feel I have been unfaithful to that dream and failed as an individual and parent . . . I have developed a significant distrust for most everyone . . . [when I stopped sending funds to the fraud scheme,] I had fear for my life and wondered if someone was going to break in and murder me . . . All the peace that I had worked so hard for my entire life was shattered."  Exhibit B, Statement 8.

## V.    Coconspirator Sentences

A number of other defendants charged as part of the Government's long-standing investigation into this criminal scheme have been convicted and sentenced in related cases in this District.  *See United States v. Rufai et al.*, 18 Cr. 201 (DLC); *United States v. Edward Normanyo*, 18 Cr. 203 (DLC); *United States v. Frederick Nyantakyi*, 19 Cr. 479 (AJN); *United States v. Farouk Appiedu et al.*, 21 Cr. 88 (JSR); *United States v. Faisal Ali*, 21 Cr. 613 (RMB); *United States v. Sadick Kissi*, 21 Cr. 64 (PAC); *United States v. Selassie Atoklo*, 22 Cr. 31 (MKV); *United States v. Mona Montrage*, 22 Cr. 617 (JPO).  Most of the prior defendants to be sentenced in the Government's investigation were significantly less culpable than Van Yeboah—they were largely

10

"middlemen," who were responsible for laundering fraud proceeds, had less tenure and influence than Van Yeboah, and were held responsible for smaller loss amounts. Nevertheless, some relevant sentences are described below:

- Fred Asante pleaded guilty to money laundering conspiracy before Judge Rakoff. *United States v. Asante*, 21 Cr. 88 (JSR). Asante was held responsible for a loss amount of between $3.5 million and $9.5 million. He was a manager or supervisor of the Conspiracy, and had prior drug convictions. The Government requested a sentence of 120 months' imprisonment, and on May 18, 2022, Judge Rakoff sentenced Asante to a term of imprisonment of 108 months.

- Celvin Freeman was convicted after trial of, among other things, wire fraud and money laundering conspiracy. *United States v. Freeman*, 21 Cr. 88 (JSR). Freeman was held responsible for a loss amount of between $1.5 million and $3.5 million. The Government requested a sentence of no less than 85 months' imprisonment, and on October 20, 2022, Judge Rakoff sentenced Freeman to a term of imprisonment of 78 months.

- Deborah Mensah pleaded guilty to money laundering conspiracy before Judge Cote. *United States v. Mensah*, 18 Cr. 201 (DLC). Mensah was held responsible for a loss amount of between $1.5 million and $3.5 million. She was also a manager or supervisor of the fraud scheme. The Government requested a sentence of 70-87 months' imprisonment, and on July 1, 2021, Judge Cote sentenced Mensah to a term of imprisonment of 70 months.

- Muftau Adamu pleaded guilty to wire fraud conspiracy before Judge Cote. *United States v. Adamu*, 18 Cr. 201 (DLC). Adamu was held responsible for a loss amount of between $550,000 and $1.5 million. He was also a manager or supervisor of the fraud scheme. The Government requested a sentence of 51-63 months' imprisonment, and on June 13, 2019, Judge Cote sentenced Adamu to a term of imprisonment of 51 months.

- Tourey Ahmed Rufai pleaded guilty to wire fraud conspiracy before Judge Cote. *United States v. Rufai*, 18 Cr. 201 (DLC). Rufai was held responsible for a loss amount of between $550,000 and $1.5 million. The Government requested a sentence of 41-51 months' imprisonment, and on April 12, 2019, Judge Cote sentenced Rufai to a term of imprisonment of 48 months.

As described above, Van Yeboah is differently situated than these defendants in that he was personally involved in defrauding victims through romance scams, while the other defendants did not have direct contact with their victims, but rather, only received fraudulent proceeds into their accounts. In addition, his loss amount substantially exceeds the loss amount attributed to almost all of the other defendants. Accordingly, the Government views Van Yeboah as far more

culpable than Mensah, Adamu, Rufai, and Freeman; and as marginally more culpable (or at least equivalently culpable) as Asante.

### VI. The Court Should Impose a Sentence at the Top of the Stipulated Guidelines Range[12]

A sentence at the top of the Stipulated Guidelines Range of 97 to 121 months' imprisonment is appropriate and no greater than necessary to reflect the seriousness of the offense, provide just punishment, and afford adequate specific and general deterrence.[13]

### A. The Seriousness of the Defendant's Conduct

Van Yeboah's conduct is extremely serious. He preyed upon the emotions of vulnerable victims to steal their money. Every aspect of his communications with his victims—individuals who thought they were falling in love with a romantic partner—was a lie. He deliberately sought out vulnerable victims; he invented fake personas to talk to the victims; he said whatever he had to say to make the victims fall in love with him; and then he came up with yet more lies to convince them to drain their life savings and send them to bank accounts controlled by his coconspirators. When he successfully tricked victims into falling in love with his invented personas, he drained them of funds however he possibly could.

The human toll of Van Yeboah's conduct is made clear by the victim impact statements submitted in the case and the cases of the defendant's coconspirators. Victims lost large portions of their life savings, money they had counted on for retirement. They were emotionally devastated to learn that the personas they had been talking to every day, personas who claimed to be in love with them, were in fact frauds. They were humiliated to learn that they were victims of romance scams. And many of them experienced permanent damage to their ability to trust others or fall in love again after being victimized. There is no other way to describe Van Yeboah's conduct than cruel.

Unlike his coconspirators who primarily laundered money, Van Yeboah did not act at a remove from his victims. He was directly and almost constantly in contact with his victims. As a result, he fully understood the emotional and social vulnerability of his victims. He fully understood what his fake relationships meant to his victims, and he fully understood what a large

---

[12] As to forfeiture, the Government respectfully requests that the Court enter a Consent Preliminary Order of Forfeiture in the amount of $10,149,429.17, which the parties have executed and is attached here as Exhibit C. As to restitution, Van Yeboah agreed in the Plea Agreement to make restitution up to the amount of $10,149,429.17. The Government is still in the process of determining a restitution amount for individual victims, and the Government requests, pursuant to 18 U.S.C. § 3664(d)(5), that the time period for restitution be deferred until after sentencing. Specifically, the Government proposes submitting an update to the Court as to restitution no less than 45 days after sentencing.

[13] Van Yeboah does not make a specific request for a sentence, and the PSR recommends a downward variance of 60 months. Because Van Yeboah was extradited to face charges in the United States, he will likely be returned to Ghana soon after completing his term of imprisonment.

chunk of their life savings he was often stealing.  In sum, he knew precisely the financial and emotional harm he was causing to his victims, and he kept doing it anyways, over and over again.

Van Yeboah's conduct was far from an aberration.  Van Yeboah engaged in the fraud scheme for *nine years*.  It wasn't isolated conduct; it wasn't a blip.  It was what he did for approximately a quarter of his life.  Indeed, it appears to be the only real job Van Yeboah has ever had.  Day after day, for years, he targeted vulnerable victims, lied to them, and stole from them.  And while Van Yeboah likely did not keep a majority of the more than $10 million he helped to steal, his financial gain from his romance scams was very substantial.  This was his job, and it was lucrative enough for him to own an expensive house, expensive jewelry, and several expensive cars.[14]

In terms of relative culpability, Van Yeboah is one of the most culpable defendants—if not the most culpable defendant—to be sentenced in any of the related cases so far.  The closest parallel is Fred Asante, who received a sentence of 108 months' imprisonment for his role as a manager or supervisor and was held responsible for laundering at least approximately $6.7 million in fraud proceeds from victims into his bank accounts, and a substantially greater amount of suspected fraud proceeds in cash.  While Asante was more culpable than Van Yeboah in terms of leadership and criminal history, Van Yeboah is more culpable in that he was directly in contact with at least four victims and received more than $10 million from victims of the scheme into his bank accounts.

For these reasons, the seriousness of the defendant's conduct and the need to provide just punishment warrant a sentence at the top of the Stipulated Guidelines Range.

## B.  The Need for Specific and General Deterrence

Specific deterrence is critical in this case.  Van Yeboah was not deterred by the arrests and convictions of many of his coconspirators over a period of years.  ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████.  And because he will presumably be returned to Ghana immediately after completion of his prison term, prison will likely be the only real deterrent to his years-long criminal conduct.  The Government will attempt to seize his fraud proceeds for forfeiture and restitution, but it is of course far harder to do so in cases where, as here, those assets are located abroad.  Nor will Van Yeboah be subject to the standard conditions of supervised release when he is returned to Ghana, and, as a result, it is unlikely that the Court will be able to continue to monitor his conduct after his release.  A very substantial prison sentence is therefore needed to deter Van Yeboah from returning to his lucrative and long-time job of scamming victims.

General deterrence is perhaps even more significant.  Romance scams are a massive problem in the United States.  The Federal Trade Commission collected 64,003 reports of romance

---

[14] Because the defendant resided in Ghana, the Government has little transparency into the amount of money Van Yeboah personally profited from the scheme, other than to look at the assets he reported to the Probation Department and Pretrial Services, which, as described above, has at times been inconsistent.

scams in 2023, with total losses of $1.14 billion.[15]  In 2025, the FBI collected 23,159 reports of romance scams with total losses of $929 million, and those reports were primarily from older adults.[16]  Those sets of numbers are almost certainly substantially *under*stating the scope of the problem, as many victims are either too humiliated to report the crime or refuse to believe that they have been scammed.

Further, romance scams are particularly difficult to investigate and prosecute.  Romance scams are often not reported to law enforcement until long after the victim has lost the money, when the trail has gone cold.  Most romance scammers operate from abroad and most are sophisticated about concealing their identity.  And the actual scammers often have several levels of money launderers between them and their victims, insulating them from further investigation.  This case is a good example of those dynamics.  The Government has convicted approximately two dozen money launderers to date, who have received fraud proceeds from various romance scams, but this is the first defendant to be charged and convicted who was actually directly in contact with romance scam victims.

Finally, individuals who engage in similar fraud schemes abroad—and their potential recruits—will undoubtedly be closely tracking the outcome of this case.  This reality is not hypothetical.  The Government has observed throughout its investigation that coconspirators in Ghana have closely followed the cases of other similarly situated defendants and are fearful of facing similar consequences.  Indeed, at least one defendant in this case remains a fugitive from justice out of an apparent fear of confronting the U.S. justice system.  The sentence in this case should send a clear message that Van Yeboah and others who engage in similar conduct will be punished to the fullest extent of the law.[17]

---

[15] https://www.ftc.gov/business-guidance/blog/2024/02/love-stinks-when-scammer-involved.

[16] https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf.

[17] As many courts and academics have concluded, lengthier sentences are particularly important in the context of economic crime, which is often based on a rational cost-benefit calculus of whether the crime is worthwhile.  *See, e.g., United States v. Johnson*, No. 16 Cr. 457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."); *United States v. Stein*, No. 09 Cr. 377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed."); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *See also* Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected

### C.  The Court Should Reject Van Yeboah's Arguments for a Downward Variance

The arguments Van Yeboah puts forward in his sentencing submission requesting lenience all fail, and cannot overcome the need for just punishment and specific and general deterrence, that warrant a sentence at the top of the Stipulated Guidelines Range.  For example:

- Van Yeboah attached a number of letters on his behalf that he describes as showing that, "Mr. Van Yeboah quietly used his resources to lift others, often strangers, and never for recognition or repayment."  (Br. at 8).  Van Yeboah may well have been financially generous within his family and his community.  But the money he was giving away was *fraud proceeds* that he stole from innocent victims, and Van Yeboah appears to have lived a lavish lifestyle in Ghana even after his financial contributions.  The fact that Van Yeboah shared stolen money with others is no reason to impose a lenient sentence.

- Van Yeboah argues that his incarceration will harm members of his family who need him. That is a frequent circumstance in criminal prosecutions, but it is Van Yeboah's own criminal conduct over nine years that has led him to face a substantial sentence.  His family circumstances should not be used to justify a lower sentence.

- Van Yeboah argues that "[t]he level of remorse that [he] has is immeasurable beyond words."  (Br. at 11).  While Van Yeboah pleaded guilty quickly in light of the overwhelming evidence against him, nothing else about his conduct suggests true remorse. He did not feel that remorse during the nine years he defrauded his victims, even when he saw coconspirators arrested.  He has not transferred any funds to try to make his victims whole.  And most importantly, ██████████████████████████████████ ████████████████████████████████████████████████████.  This is the conduct of a man who regrets getting caught, not one who regrets committing the crime.

- Van Yeboah argues that this was "aberrant conduct" in "an otherwise law-abiding life." (Br. at 10-11).  That is not true.  As described above, Van Yeboah's conduct was far from a single lapse in judgment.  He personally defrauded his victims for nine years.  This was his job for nearly a decade, and this is who Van Yeboah is.  His sentence should reflect the severity of his conduct.

---

punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence.").

## VII.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence at the top of the Stipulated Guidelines Range of 97 to 121 months' imprisonment.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/
_____
Kevin Mead
Mitzi Steiner
Assistant United States Attorneys
(212) 637-2211 / -2284

CC:  Counsel of Record (by ECF)